1

2

3

4

5

# UNITED STATES DISTRICT COURT

6

## EASTERN DISTRICT OF CALIFORNIA

7

| | | |
|---|---|---|
| JEROD LATINA, | ) | 1:11-cv-01453-SKO |
| | ) | |
| | ) | **ORDER REGARDING PLAINTIFF'S** |
| Plaintiff, | ) | **SOCIAL SECURITY COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | (Docket No. 1) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

8

9

10

11

12

13

14

15

16

## I.  **BACKGROUND**

17

Plaintiff Jerod Latina ("Plaintiff") seeks judicial review of a final decision of the

18

Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for

19

Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act").

20

42 U.S.C. § 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were

21

submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

22

Judge.[1]

23

## II.  **FACTUAL BACKGROUND**

24

Plaintiff was born in 1989, and in 1991 Plaintiff's mother applied for SSI on behalf of

25

Plaintiff due to infant-onset diabetes; Plaintiff's SSI application was approved in 1993.  (AR 55-61,

26

177-89, 385.)  After Plaintiff turned 18 years of age, the Social Security Administration ("SSA" or

27

28

_____

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 7, 16.)

1    "Agency") redetermined Plaintiff's eligibility for SSI, and found him no longer disabled as of

2    February 8, 2008.[2]  (AR 389-92.)  Plaintiff maintained that he remained disabled due to diabetes

3    from infancy, chronic fatigue, liver complications, and back pain caused by scoliosis.  (AR 480,

4    489.)

5    **A.   Relevant Medical Evidence**

6          On November 16, 2007, approximately two months after Plaintiff turned 18, he was seen by

7    John B. Krpan, D.O., at Mark Twain St. Joseph Hospital.  Dr. Krpan indicated that Plaintiff and his

8    identical twin brother were life-long type 1 diabetics and noted that there had been "no

9    complications" with Plaintiff's diabetes since he had last been seen.  (AR 564-65.)  Dr. Krpan

10   indicated that Plaintiff and his brother had returned to home schooling, and Plaintiff was planning

11   to graduate from high school in the spring.  (AR 564.)  Plaintiff's insulin medications were

12   continued, and a comprehensive metabolic panel and complete blood count were performed.

13   (AR 564.)

14         On November 30, 2007, Dr. Krpan noted that Plaintiff's recent blood work had shown that

15   his "hemoglobin A1C was 10.1 [and] estimated mean plasma glucose [was] 282."  (AR 558.)

16   Plaintiff and his mother informed Dr. Krpan that they believed that Plaintiff's "sugars will be much

17   better controlled" because Plaintiff was currently being home-schooled after having "some issues"

18   attending the local public high school.  (AR 558.)  Dr. Krpan noted that Plaintiff had "had been in

19   poor control," but was "going to do a better job about administrating his insulin now that he is being

20   home[-]schooled."  Dr. Krpan examined Plaintiff's back and noted that he had "some fullness in the

21   right paraspinous musculature in the lower aspect of the T-spine," but "did not appreciate a real

22   significant scoliosis, although there was a slight bit with him flexed at the waist."  (AR 558.)

23   Plaintiff was referred for a thoracic x-ray due to back pain, and was scheduled for a repeat

24   hemoglobin A1C.  (AR 559.)

25

26

27         [2] Plaintiff's opening brief asserts that Plaintiff's identical twin brother, Jeremy, was also found disabled in 1993

28   for the same impairment and was subsequently determined to have remained disabled after his 18th birthday.  (Doc. 14, 2:14-3:5.)

1    On January 24, 2008, Plaintiff was seen by Phillip Seu, M.D., who performed a

2    comprehensive internal medicine evaluation.  (AR 521-25.)  Plaintiff's chief complaints were

3    diabetes and liver disease, as well as complaints for occasional back pain and headache.  (AR

4    521-22.)  Plaintiff reported that he "occasionally goes snow boarding.  He walks for exercise.  He

5    plays paint ball.  He helps around the house with chores."  (AR 522.)  Upon examination, Dr. Seu

6    observed that Plaintiff appeared "fit and well developed.  His movements are not guarded.  He has

7    no problems walking, sitting, standing, or getting on and off the exam table."  (AR 522.)  Dr. Seu

8    diagnosed Plaintiff with type 1 diabetes, noting that "[t]here is currently no evidence of end organ

9    damage"; Plaintiff was also diagnosed with a history of elevated liver enzymes and peptic ulcer

10   disease by history.  (AR 524.)  Dr. Seu provided a functional assessment and opined that Plaintiff

11   was "without limitations" to the number of hours he should be able to stand, walk, and/or sit in an

12   eight-hour workday.  Plaintiff was also "without limitations" to the amount of weight he could lift

13   and carry; had "no postural limitations" on bending, stooping, or crouching; had "no manipulative

14   limitations" on reaching, handling, feeling, grasping, and fingering; and had "no relevant visual,

15   communicative, or workplace environmental limitations."  (AR 524.)

16   On February 8, 2008, state agency physician Ian Ocrant, M.D., reviewed Plaintiff's medical

17   evidence for an "[a]ge 18 redet[ermination]" of benefits.  (AR 526-27.)  Dr. Ocrant noted that

18   Plaintiff had shown "poor compliance" treating his diabetes, but did not have "any functional

19   limitations as a result."  (AR 527.)  Dr. Ocrant stated that Plaintiff appeared to have exaggerated the

20   seriousness and functional abilities on his Fatigue Questionnaire ("FQ"), and that Plaintiff was

21   "more active than what he admits to on FQ."  (AR 527.)  Dr. Ocrant opined that a finding of "[n]ot

22   severe appears most appropriate" but that a limitation of "[m]edium would be giving [Plaintiff] the

23   benefit of the doubt re: some of his functional complaints."  (AR 527.)

24   On March 15, 2008, Plaintiff was seen by Dr. Krpan for "continued complaints of back pain"

25   that had been "going on for a couple of months."  (AR 590.)  Plaintiff denied any specific injury.

26   (AR 590.)  Dr. Krpan indicated that an x-ray performed in February 2008 "showed mild scoliosis,

27   perhaps signifying muscle spasm" and that there were "no fractures or dislocations" and "no arthritic

28   process."  (AR 590.)  Dr. Krpan's physical examination "focused on the back" and found that

Plaintiff had "some muscle spasm in the midthoracic range" and "malalignment of the spinous process" at approximately T7 to T8; "[o]therwise, the exam was normal" and Plaintiff had a "good range of motion" with a "full range of motion in all planes with some discomfort." (AR 590.)

On April 25, 2008, Plaintiff was seen by Donald K. Westbie, M.D., based on a referral from Dr. Krpan. (AR 657-58.) Dr. Westbie indicated that Plaintiff had been diabetic since infancy but that "[o[verall he [was] not doing bad[ly]," although he had "less than optimal control" of his blood sugars, which tended to be high in the morning. (AR 567-58.) Dr. Westbie noted that Plaintiff "was recently found to have scoliosis." (AR 658.) Plaintiff also had "very dramatically elevated liver function studies at one time as did his twin. Apparently no diagnosis was ever made for that." (AR 658.) Dr. Westie found that Plaintiff had "[s]ome muscle weakness, some fatigue." (AR 658.) The assessment and treatment plan indicated that Plaintiff needed an eye exam and "updated labs." (AR 658.)

On May 26, 2008, Dr. Krpan indicated that he had a phone conversation with Plaintiff's mother, who was had called regarding a bone density exam ordered by Dr. Westbie. (AR 609.) Plaintiff's mother was "quite emotional," and "made some accusations that [Dr. Krpan] should have checked [Plaintiff's] bone density prior to [that] year." (AR 609.) Dr. Krpan indicated that he had a "conversation" on "multiple occasions" with Plaintiff's mother during which he recommended that Plaintiff and his twin brother, "both type 1 diabetics, get established with an endocrinologist" and that Dr. Krpan would "take care of their acute needs, but . . . was not comfortable with the chronic care of a type [1] diabetic." (AR 609.) Dr. Krpan noted that a "[r]eview of the chart reveals hemoglobin A1Cs generally in the 10-11 range in both twins and infrequent visits, usually twice to three times a year and . . . those are usually more acute visits for acute injuries than maintenance diabetes appointments." (AR 609.)

Plaintiff returned to Dr. Westbie on June 4, 2008. (AR 653.) Dr. Westbie noted that Plaintiff was a "[b]rittle, type 1 diabetic" who was "[g]enerally doing well" but needed to "tighten up the control of his diabetes." (AR 653.) Plaintiff had "some previous elevation in liver function test" but his test results "look[ed] good at [that] point." (AR 653.) Plaintiff was planning to attend college

in the Folsom area, and Dr. Westbie noted that Plaintiff was "obviously going to need some very close attention to diet." (AR 653.)

On August 18, 2008, Plaintiff was seen by Dr. Westbie for a follow-up visit on "very brittle type 1 diabetes, scoliosis, [and] unexplained lactic acidosis." (AR 648.) Dr. Westbie noted that Plaintiffs' twin has severe osteoporosis" and that a "bone density [exam] had not been scheduled" for Plaintiff. (AR 648.) Plaintiff had back pain in his lower thoracic spine. (AR 648.)

On February 11, 2009, Plaintiff returned to Dr. Westbie, who noted that Plaintiff had "compounding problems" due to his diabetes that "include[d] severe kyphoscoliosis, although he has not had the fractures that his brother has had." (AR 664.) Plaintiff's diabetes test results were "terrible." (AR 664.) Plaintiff had been living in San Diego with his twin brother, but they had returned home. Plaintiff had lost weight, developed a diabetic-related "severe rash," and was "in general . . . washed out and tired." (AR 664.) Extensive lab work was ordered, and Dr. Westbie was seeking to refer Plaintiff "to the bone disease [center] at Stanford along with his brother." (AR 664.) Dr. Westbie stated that there appeared to be "some element of possible malabsorption" and "[m]aybe even a mitochondrial myopathy." (AR 664.)

On April 8, 2009, Dr. Westbie saw Plaintiff for a follow-up visit. (AR 663.) Plaintiff's blood sugars were "up and down, a lot in the 200 to 300 range." (AR 663.) Plaintiff was "having a lot of pain from his back" and Dr. Westbie noted that Plaintiff "does tend to sit in a somewhat twisted position for pain relief." (AR 663.) Plaintiff was attempting to perform some light exercise, and his "muscle strength [did] not seem to be really impaired." (AR 663.) Plaintiff was not attending school and was "working a little bit with his mother, but that is not terribly time consuming." (AR 663.) Dr. Westbie was seeking to refer Plaintiff to the "bone and metabolic unit at Stanford." (AR 663.)

On April 9, 2009, Dr. Westbie wrote a referral letter to David Karpf, M.D., at Stanford University Medical Center on behalf of Plaintiff and his twin brother. (AR 684.) Dr. Westbie admitted to being "somewhat out of [his] depth" when it came to treating the twins. (AR 684.) Dr. Westbie stated that Plaintiff had "significant scoliosis," with both brothers having "very brittle type 1 diabetes, concomitant findings of severe vitamin D deficiency with abnormal DEXA [dual energy

X-ray absorptiometry] screens." (AR 684.) Dr. Westbie noted that the brothers were "somewhat noncompliant, not terribly unexpected in 19-year-olds." (AR 684.) Dr. Westbie concluded that the twins should be seen at Stanford's tertiary care center, "where they can have the full advantage of metabolic bone evaluations, intensive treatment of their very brittle diabetes, etc." (AR 684.)

On May 28, 2009, Plaintiff returned to Dr. Westbie, who noted that Plaintiff's "[s]ugars are terrible, average is somewhat above 300" and that Plaintiff had lost weight. (AR 662.) Dr. Westbie indicated that he needed to "update labs" and "needed a current bone density on [Plaintiff], which he has been trying unsuccessfully to get." (AR 662.) Dr. Westbie further noted that Plaintiff "may have to be further evaluated for the possibility of underlying sprue." (AR 662.)

On June 22, 2009, Dr. Westbie completed a Child Disability Report on behalf of Plaintiff. (AR 660.) Dr. Westbie diagnosed Plaintiff with diabetes, chronic lactic acidosis, and Vitamin D deficiency, and noted clinical findings of elevated blood sugars, chronic lactic acidosis, low bone density, scoliosis, and poor muscle strength. (AR 660.) Plaintiff was treated with insulin therapy, but his blood sugars remained elevated. (AR 660.) Dr. Westbie opined that Plaintiff's prognosis was "poor." (AR 660.)

On August 10, 2009, Dr. Westbie completed a Physical Medical Source Statement. (AR 748-50.) Dr. Westbie opined that Plaintiff could lift 20 pounds occasionally and less than 10 pounds frequently; could stand and/or walk less than 2 hours and sit less than 6 hours in an 8-hour workday; could never climb, balance, stoop, kneel, crouch, or crawl, and could only occasionally reach, handle, finger, and feel. (AR 748-49.)

On August 10, 2009, Plaintiff was seen by Jenna Brimmer, M.D., who performed a comprehensive internal medical evaluation. (AR 751-62.) Plaintiff reported that he had back pain since the age of 12 or 13 that had progressively worsened. (AR 751.) Plaintiff rated the pain in his back between 6 and 8 out of a scale of 1 to 10, with 1 being no pain and 10 being severe pain, and noted that the pain was associated with spasms of his mid-back that occurred four or five times a week. (AR 751.) Plaintiff stated that "any movement of his upper body exacerbates his pains such as twisting or turning his torso and pushing and pulling activities." (AR 752.) Plaintiff estimated that he could stand 30 to 40 minutes at a time, walk 20 to 25 minutes, sit 20 minutes, and was limited

6

to lifting 35 pounds. (AR 752.) Plaintiff stated that his pain was relieved by "lying flat" and "asked if he could lie down for the evaluation." (AR 751-52.) Dr. Brimmer noted that Plaintiff was able to get up from a seated position without the use of his upper extremities and performed the physical exam sitting on the table and standing when requested. (AR 751.) Plaintiff could "get up from the supine position" and "move around the exam room . . . without difficulty." (AR 753.) Dr. Brimmer's narrative report indicated that Plaintiff had no limitations (AR 755); however, the form Dr. Brimmer completed indicated that Plaintiff could lift and carry up to 10 pounds frequently and 20 pound occasionally, could sit 6 hours and stand/walk 3 hours in an 8-hour day, and could occasionally climb stairs and ramps, climb ladders or scaffolds, and balance, stoop, kneel, crouch, and crawl. (AR 756-59.)

**B.     Lay Testimony**

On October 30, 2007, Plaintiff completed a Fatigue Questionnaire. (AR 508-09.) Plaintiff stated that he had been sick a lot, could not attend public school, and needed to be home-schooled because he would get dehydrated "from going to the bathroom so much" while at school and his "sugars would run low" during certain classes. (AR 508.) Plaintiff indicated that he would "get good grades" while being home-schooled, where he had the ability to "stop during the day and take a nap or just rest." (AR 508.) Plaintiff stated that he would get "dizzy" from fatigue, and when he was home he could adjust his low blood sugars by eating and resting. (AR 508.) He would get dizzy and experience pain while doing chores, and would need to take a break, check his sugars, and lie down. (AR 508.)

There are two unsigned disability reports (AR 479-502) that are apparently attributable to Plaintiff's mother. (*See* AR 21-22.) The disability reports indicate that Plaintiff suffered from diabetes since infancy, chronic fatigue syndrome, and liver complications. (AR 480.) The reports state that Plaintiff "experiences chronic fatigue and weakness," and that "[h]is joints hurt often and [he] is required to take NSAID [pain relief medications] regularly." (AR 487.) Plaintiff also complained of "dizziness often[,] which is relieved when he [lies] down." (AR 487.) The reports further indicated that Plaintiff could not attend school "because he has to lie down a lot." (AR 493.) Plaintiff would get "light[-]headed" and needed "constant monitoring of his blood pressure." (AR

493.) Further, the reports indicate that "[s]ometimes [Plaintiff] is bedridden; he sleeps [and] has no energy to get up [and] even go to the bathroom. His mother has to bring him food. [He has] [v]ery low energy all the time." (AR 500.)

**C.     Administrative Hearing**

The Commissioner denied Plaintiff's re-determination of disability initially and again on reconsideration; consequently, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (AR 389-409.) On June 24, 2009, ALJ Laura Havens held a hearing in which Plaintiff, represented by counsel, and Plaintiff's mother Casey Margolis testified. (AR 781-810.) Vocational expert ("VE") Susan Moranda was present at the hearing via phone, but did not testify. (AR 781-810.)

Plaintiff testified that he had a high school diploma, and could read the newspaper and do simple adding and subtracting. (AR 787-88.) Plaintiff had not worked since he had been out of school. (AR 788.) He lived with his mother and twin brother. (AR 788.) Plaintiff was able to dress and bathe himself, although he indicated that it was "kind of difficult" depending on how he slept on his back. (AR 788-89.) Plaintiff was able to do chores such as washing dishes, but only if there were "not that many dishes" and he could stand for approximately 10 minutes. (AR 789.) Plaintiff did not do any cooking, mopping, sweeping, grocery shopping, or yard work, but he did his own laundry. (AR 789.) Plaintiff indicated that he used to snowboard, but "can't do that anymore." (AR 790.) Plaintiff could also read for half an hour, depending on back pain, and would watch "about two [or] three" hours of television a day. (AR 790.)

Plaintiff was taking insulin for his diabetes, which helped control his blood sugars. (AR 791-92.) The diabetes affected the circulation to Plaintiff's feet, and he would get "horrible" and "annoying" tingling. (AR 792.) Plaintiff would have to lie down due to problems with his feet and pain in his back, which was "like an old man's back." (AR 792-93.) Plaintiff would feel pain on his upper and middle back, which he said felt like a "12" on a pain scale of 1 to 10. (AR 793.) Medication helped relieve the pain, but made him drowsy. (AR 793.) Plaintiff also experienced back spasms and cramps. (AR 801.)

Plaintiff stated that he would experience "ulcer pain" in his stomach. (AR 795.) Plaintiff was weak and unable to work out because he could not lift much weight; however, he also testified that he could lift between 70-75 pounds. (AR 793, 795.) Plaintiff was also unable to gain body weight. (AR 795.) Plaintiff stated that he tried to go back to public school for his last year of high school, but it was "too strenuous" and he "couldn't walk back and forth to the classes and stay up for lunch" because the lunch break was "kind of long." (AR 796.) Plaintiff also could not participate in the physical education classes. (AR 796.) Plaintiff lasted about four or five months at public school before returning to home-schooling, where he was able to lie down and take medication for his back without fear of becoming dizzy from the medication. (AR 797.) Plaintiff testified that he was currently lying down on a regular basis throughout the day. (AR 797-98.) Plaintiff also experienced problems with the circulation in his feet and would need to elevate them. (AR 799.) Plaintiff would "spend a lot of time" monitoring his blood sugars trying to "make sure [his] sugars . . . stay at a moderate level" and "not get too high." (AR 800-01.)

Plaintiff testified that one of the Social Security doctors did not examine him, but merely looked at a skin rash and told him it was not related to diabetes even though other doctors had stated that the rash was diabetes related. (AR 801.) The Social Security doctor did not examine Plaintiff's back. (AR 801.)

Plaintiff's mother testified that she had just received confirmation of Plaintiff's referral to Stanford Medical Center for evaluation of Plaintiff's malabsorption and inability to absorb Vitamin D as a condition of his diabetes. (AR 805-06.) Plaintiff's scoliosis was "progressing rapidly." (AR 805.) Plaintiff's mother relayed Plaintiff's history of suffering with infancy-onset type 1 diabetes, including Plaintiff's inability to sleep, his need to rest due to fatigue, the need for liver biopsies when Plaintiff was in the ninth grade because the liver enzymes "were off the charts," the need to constantly control the blood sugar to the point that Plaintiff had received over 200,000 injections by the time he was 12, and Plaintiff's suffering from debilitating pain. (AR 806-08.)

**D.   ALJ's Decision**

On January 19, 2010, the ALJ issued a decision finding Plaintiff not disabled since February 8, 2008, the date Plaintiff was found to be no longer disabled pursuant to a disability redetermination

after his 18th birthday. (AR 15-26.) Specifically, the ALJ found that (1) Plaintiff had attained age 18 on September 22, 2007, and was notified that he was found no longer disabled as of February 8, 2008, based on a redetermination of disability under the rules for adults who file new applications; (2) Plaintiff had severe impairments of diabetes, scoliosis, and chronic fatigue syndrome; (3) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had the residual functional capacity ("RFC")[3] to perform a full range of medium work as defined in 20 C.F.R. Part 416.967(c); (5) Plaintiff had no past relevant work; (6) Plaintiff was defined as a younger individual on the date the SSI application was filed; (7) Plaintiff had at least a high school education and was able to communicate in English; (8) transferability of job skills was not an issue because Plaintiff did not have past relevant work; (9) there were jobs that existed in significant numbers in the national economy that Plaintiff could perform; and (10) Plaintiff's disability ended on February 8, 2008, and he had not become disabled again since that date. (AR 20-26.)

Plaintiff sought review of this decision before the Appeals Council. On June 30, 2011, the Appeals Council denied review. (AR 10-14.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

**E.     Plaintiff's Contentions on Appeal**

On August 29, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff contends that the ALJ made erroneous credibility determinations regarding Plaintiff and his mother, improperly rejected the treating physician's records, and provided an improper RFC analysis. (Doc. 12.)

### III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.*

of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities.

1   *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the

2   claimant has a severe impairment or combination of impairments that meets or equals the

3   requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.*

4   §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

5   has sufficient RFC despite the impairment or various limitations to perform his past work.  *Id.*

6   §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show

7   that the claimant can perform other work that exists in significant numbers in the national economy.

8   *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in

9   the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094,

10  1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

11                                          **V.  DISCUSSION**

12  **A.      The ALJ's Consideration of Medical Evidence**

13          Plaintiff contends that the ALJ failed to provide legally sufficient reasons for rejecting the

14  opinions of the treating physician.  (Doc. 12, 10:26-12:16.)  Defendant asserts that the ALJ properly

15  considered the medical evidence.  (Doc. 14, 6:23-9:8.)

16          **1.      Legal Standard**

17          The medical opinions of three types of medical sources are recognized in Social Security

18  cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

19  the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

20  (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

21          Generally, a treating physician's opinion should be accorded more weight than opinions of

22  doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater

23  weight than a non-examining physician's opinion.  *Id.*  Where a treating or examining physician's

24  opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing"

25  reasons for rejecting the treating physician's ultimate conclusions.  *Id.*  If the treating or examining

26  doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific

27  and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by

28  substantial evidence in the record.  *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 2. The ALJ's Properly Discounted Dr. Westbie's Findings

Plaintiff contends that the ALJ wrongfully rejected Dr. Westbie's opinions because the ALJ "inaccurately . . . perceived Dr. Westbie's understanding of [Plaintiff's] condition and basis for that understanding." (Doc. 12, 4-6.) Plaintiff asserts that the ALJ provided the following reasons for rejecting Dr. Westbie's assessment – "1) it was supposedly inconsistent with other medical evidence, 2) was not supported by Dr. Westbie's treatment records, 3) appeared to rely almost exclusively on [Plaintiff's] subjective complaints, and 4) there existed no medical evidence supporting Dr. Westbie's limitations" – and that the reasons were "contrafactual" and "vapidly disconnected from the facts." (Doc. 12, 11:7-11, 12:13.) Defendant contends that the ALJ provided "valid reasons for rejecting a treating source opinion." (Doc. 14. 7:22-23.)

In considering Dr. Westbie's assessment of Plaintiff's capabilities, the ALJ noted the following:

> Dr. Westbie provided a Medical Source Statement stating that the claimant can lift or carry 20 pounds occasionally, less than 10 pounds frequently, stand or walk less than 2 hours during a normal 8-hour workday, and needs to alternate between sitting and standing every 30-60 minutes. The claimant can never climb, balance, stoop, kneel, crouch, crawl and [can] occasionally reach, handle, finger, and feel objects. He must avoid all exposure to heights, machinery, and temperature extremes . . . . This opinion is similarly given little weight, as it is inconsistent with other medical evidence, is not supported by Dr. Westbie's own treatment records, and appears to rely almost exclusively on the claimant's subjective complaints. There is no objective medical evidence supporting the suggested limitations.

(AR 24.)

The Ninth Circuit has "held that 'clear and convincing' reasons are required to reject the treating doctor's ultimate conclusions." *Lester*, 81 F. 3d at 830 (*citing Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988)). Further, if the treating doctor's opinion is contradicted by another doctor, the ALJ "may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Id*. As such, to reject a treating physician's opinion, the ALJ must provide an interpretation of the facts and conflicting clinical evidence, and make a finding

based on that interpretation. *See Tommasetti*, 533 F.3d at 1041. It is improper for the ALJ to set forth conclusions determining that a doctor's findings are rejected without providing an interpretation of the facts. "The ALJ must do more than offer [her] conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Embrey*, 849 F.2d at 421-22.

Here, the ALJ provides an extensive discussion of Dr. Westbie's treating records and sets forth several reasons and explanations for rejecting Dr. Westbie's opinions. (*See* AR 22-23.) Specifically, the ALJ states that, following Dr. Westbie's initial examination of Plaintiff, "Dr. Westbie noted that the claimant was not doing bad, his energy and appetite were fairly good, and noted that according to the claimant he had recently been diagnosed with scoliosis." (AR 22.) Further, Dr. Westibie "found no evidence of any end organ or other damage attributable to diabetes mellitus." (AR 22.) The ALJ acknowledged that Dr. Westbie "observed some muscle weakness and fatigue," and indicated that Plaintiff was taking medication "for muscle spasms related to scoliosis," but also noted that Dr. Westbie had informed Dr. Krpan that Plaintiff "was 'not really doing badly at this point, beyond less than optimal control' of diabetes, diligence and compliance issues." (AR 22.)

The ALJ found that on June 5, 2008, "a diagnosis of mild scoliosis was made" by Dr. Westbie, "but there were no negative findings on the examination" and that the "doctor's assessment was that the claimant was generally doing well, but needed to tighten up control of his diabetes." (AR 22.) The ALJ determined that "[l]ater treatment records contain further notes showing little change in findings or reported symptoms," noting that Dr. Westbie found Plaintiff to be "stable" and that, while modest scoliosis was reported, "[n]o other pain response was indicated or noted." (AR 22.) Additionally, the ALJ stated that Dr. Westbie's noted that Plaintiff "showed some improvement" and, while he "reported having a lot of back pain," he also "reported doing light exercise and evidently was doing some type of work activity." (AR 22-23.) The ALJ found that "[t]here were no negative findings indicated." (AR 23.)

The ALJ determined that "Dr. Westbie's subsequent treatment records suggest a deterioration of the claimant's medical condition, but the inferences were not supported by clinical findings,

examination, or test results." (AR 23.)  The ALJ noted that while Dr. Westbie recorded that Plaintiff had "'significant scoliosis,' . . . [t]here was no mention of clinical observations or findings suggesting a change from the earlier diagnosis of mild or modest scoliosis.  There [was] no medical evidence that Dr. Westbie ever obtained an x-ray or other diagnostic test to confirm the extent of scoliosis, only relying on the claimant's subjective reporting symptoms."  (AR 23.)

As noted above, the ALJ provided four reasons for rejecting Dr. Westbie's findings – his opinion "is inconsistent with other medical evidence, is not supported by Dr. Westbie's own treatment records, and appears to rely almost exclusively on the claimant's subjective complaints.  There is no objective medical evidence supporting the suggested limitations."  (AR 24.)

"The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).  Further, the ALJ need not recite the "magic words" of "I reject [a doctor's opinion] opinion about the onset date because . . ."; the court can draw reasonable inferences that exist from the ALJ's opinion, provided that the ALJ "summarized the facts and conflicting clinical evidence in detailed and thorough fashion, stating his interpretation and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

Here, the ALJ's analysis of Dr. Westbie's treating records provides a basis and explanation for the reasons given by the ALJ for rejecting Dr. Westbie's opinion.  The ALJ found that there were internal inconsistencies between Dr. Westbie's treatment records and his findings, specifically noting that Dr. Westbie stated that Plaintiff's scoliosis was "mild," that Plaintiff was "not doing bad [and] his energy and appetite were fairly good," that Dr. Westbie had written to Dr. Krpan that Plaintiff "was not really doing badly at this point," and that Plaintiff "was generally doing well, but needed to tighten up control of his diabetes."  (AR 22.)  Dr. Westbie also noted that Plaintiff was "doing light exercise and . . . some type of work activity." (AR 23.)   The ALJ found that these records are inconsistent with Dr. Westbie's conclusions regarding Plaintiff's limitations because the treatment notes indicated, for example, that Plaintiff's condition was "mild" and that he was "generally doing well" and thus did not support the severity of the limitations set forth by Dr. Westbie.  (AR 23, 24.)

15

1    If a doctor's conclusions are not consistent with his own findings, that is a specific and

2    legitimate reason for rejecting that opinion. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986)

3    (per curiam) (treating doctor's conclusory opinion that claimant was disabled was properly rejected

4    by ALJ when it was internally inconsistent and not consistent with doctor's prior medical reports).

5        Further, the ALJ determined that Dr. Westbie's "treatment records suggest a deterioration

6    of the claimant's medical condition, but the inferences are not supported by clinical findings,

7    examination, or test results." (AR 23.)  The ALJ noted that Dr. Westbie made "no mention of

8    clinical observations or findings suggesting a change from the earlier diagnosis of mild or moderate

9    scoliosis. There is no medical evidence that Dr. Westbie ever obtained an x-ray or other diagnostic

10   test to confirm the extent of the scoliosis." (AR 23.)  It is appropriate for an ALJ to consider the

11   absence of supporting findings and the inconsistency of conclusions with the physician's own

12   findings in rejecting a physician's opinion. *Johnson v. Shalala*, 60 F.3d 1428, 1432-33 (9th Cir.

13   1995); *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Magallanes*,

14   881 F.2d at 751; *Young*, 803 F.2d at 968.

15       Additionally, since there are no objective medical findings to support Dr. Westbie's opinion,

16   the ALJ surmised that Dr. Westbie "only rel[ies] on the claimant's subjective reporting of

17   symptoms."  Plaintiff's own statements as to pain or other symptoms cannot, by themselves,

18   establish a disability.  *See* 20 C.F.R. § 416.929(a) ("However, statements about your pain or other

19   symptoms will not alone establish that you are disabled; there must be medical signs and laboratory

20   findings which show that you have a medical impairment(s) which could reasonably be expected to

21   produce the pain or other symptoms alleged and which . . . would lead to a conclusion that you are

22   disabled.") As such, the ALJ's determination that Dr. Westbie relied on Plaintiff's subjective

23   complaints is a specific and legitimate reason to reject Dr. Westbie's findings.

24       The ALJ also found that Dr. Westbie's opinion was inconsistent with other medical evidence.

25   While the ALJ did not enumerate the inconsistencies, the Court can make inferences from the ALJ's

26   analysis of the examinations State Agency examining physician Dr. Seu, and the findings of the

27   non-examining physician Dr. Ocrant.  (AR 23-24.)

28

The ALJ's decision states that Dr. Seu reported Plaintiff "complained of occasional swelling in his feet, various skin rashes, occasional back pain and headaches" but also stated that he engaged in "activities of snowboarding, playing paint ball, spending time with friends, and walking for exercise." (AR 23.) Dr. Seu's examination indicated that Plaintiff "had no trouble walking, sitting, standing, or getting on or off the examination table.  His gait was normal.  Romberg was absent, and all range of motion testing was within normal limits.  Motor strength and muscle bulk and tone were normal." (AR 23.)  The ALJ may rely upon the findings of an examining physician such as Dr. Seu in making his decision.  "Reports of consultative physicians called in by the [Commissioner] may serve as substantial evidence." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (citations omitted); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (An examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination.").

Further, Dr. Ocrant opined that Plaintiff "could sit 8 hours, with no limitation in standing or walking, and could carry without limitation [as to weight].  No postural, manipulative, visual, communicative, or workplace environmental limitations were suggested." (AR 23.)  Dr. Ocrant opined that Plaintiff's "symptoms appeared to be exaggerated [and] that he was able to do more than acknowledged," concluding that "a finding of no severe impairment was justified by the medical evidence, but suggested a medium residual functional capacity, giving the claimant the benefit of the doubt as to intensity, severity, and frequency of symptoms alleged." (AR 23.)

The Commissioner may rely upon the opinions of nonexamining physicians when determining Plaintiff's RFC.  The Commissioner considers "all evidence from nonexamining sources to be opinion evidence."  20 C.F.R. § 416.927(e).  "Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative

1  review." SSR-96-6p.[4]   Accordingly, the ALJ properly relied upon the opinions of Drs. Seu and

2  Ocrant in determining that Dr. Westbie's findings were inconsistent with other medical evidence.

3          As such, based on the ALJ's analysis of Dr. Westbie's treatment records, the ALJ provided

4  an explanation of the specific and legitimate reasons to reject Dr. Westbie's findings by showing that

5  they were inconsistent with his own treatment and other medical records and were not supported by

6  objective medical evidence.

7          **3.       The ALJ's RFC Determination was Proper**

8          Plaintiff contends that the ALJ failed to properly analyze the medical evidence and assess the

9  Plaintiff's RFC.   (Doc. 12, 12:17-14:4.)   Defendant asserts that the ALJ's analysis of the medical

10  record and RFC assessment was proper.   (Doc. 14, 6:23-9:8.)   An RFC assessment is the most that

11  a claimant can do despite his limitations.  20 C.F.R. § 416.945(a)(1).   The Agency assesses an RFC

12  "based on all the relevant evidence in [the] case record."  *Id.*

13          Plaintiff contends the ALJ improperly relied on Drs. Seu and Ocrant's opinions and

14  improperly discounted Dr. Westbie's findings in determining that Plaintiff had an RFC to perform

15  medium work.  As noted above, Dr. Westbie's opinion was properly rejected, and the ALJ may rely

16  on the findings of the examining and non-examining physicians in making the RFC determination.

17  *See Sandgathe*, 108 F.3d at 980; *Tonapetyan*, 242 F.3d at 1149.  The ALJ provided specific and

18  legitimate reasons for rejecting and accepting the medical source opinions relied upon in forming

19  the RFC, and explained that reasoning in her decision.

20          The Court may not substitute its judgment for that of the Commissioner.  *Macri*, 93 F.3d at

21  543.   The Court must instead determine whether the Commissioner applied the proper legal

22  standards and whether substantial evidence exists in the record to support the Commissioner's

23  findings.  *See Lewis*, 498 F.3d at 911.  "Where evidence is susceptible to more than one rational

24  interpretation, it is the ALJ's conclusion that must be upheld" unless "it is not supported by

25

26  _____

27          [4] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the
Social Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).   Once published, these rulings are binding
precedent upon ALJs.  *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*,

28  172 F.3d 690, 692 n.2 (9th Cir. 1999).

substantial evidence or it is based on legal error." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citations and internal quotation marks omitted).

Here, the ALJ's rejection of Dr. Westbie's opinion and the reliance on the opinions of Drs. Seu and Ocrant are supported by substantial evidence in the record and are not based on legal error. Accordingly, the ALJ did not err in determining the RFC, and the ALJ's decision must be upheld.

**B.    The ALJ's Determination of Plaintiff's Credibility**

Plaintiff contends that the ALJ improperly rejected Plaintiff's statements and found him to be less than credible. (Doc. 12, 8:18-10:21.) The Commissioner asserts that the ALJ provided valid reasons for not finding Plaintiff's testimony fully credible.  (Doc. 14, 9:10-12:4.)  In considering Plaintiff's credibility, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the [ALJ's] residual functional capacity assessment." (AR 22.)

**1.    Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection. *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

1    *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.*

2    *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529,

3    416.929.

4
5           **2.      The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's
                      Subjective Complaints**

6           The ALJ found that Plaintiff's medically determinable impairments could reasonably be

7    expected to produce the alleged symptoms; however, the "statements concerning the intensity,

8    persistence and limiting effects of these symptoms are not credible to the extent that they are

9    inconsistent" with the RFC. (AR 22.)  Therefore, absent affirmative evidence of malingering, the

10   ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing. *Vasquez*, 572 F.3d

11   at 591.

12          The ALJ provided numerous reasons as to why she found Plaintiff "not credible" to the

13   extent that his described symptoms were "inconsistent" with the RFC determination.  (AR 22.)

14   Specifically, the ALJ found that:

15
16          The claimant has at most mild symptoms related to scoliosis.  In an examination
            record dated November 30, 2007[,] there was no significant scoliosis found, although
17          the examining doctor did find some limitation on waist flexion. The claimant alleges
            that he was unable to attend school and had to be home-schooled because of his
18          medical condition, but that allegation is not supported by the record.  In the
            November 30, 2007[,] treatment record the examiner noted that the claimant was not
19          attending school because of "some issues at the local high school . . . ."  There is
            nothing in the medical record that shows he was not able to attend high school
20          because of medical problems, but this last record suggests behavioral or personal
            issues interfered with school attendance.

21   (AR 22)

22          The ALJ also determined that:

23
24          [A]s of January 2008 the claimant reported snowboarding as a recreational activity,
            clearly in conflict with the disability report statements from November 2007, just
25          2 months earlier, that the claimant was partially bedridden and constantly fatigued.
            His symptoms are clearly exaggerated when compared to the medical evidence.

26   (AR 24.)

27   ///

28   ///

1    Additionally, the ALJ noted that when Plaintiff was examined by Dr. Brimmer,

2    [Plaintiff] was able to get up from the supine position without difficulty, and was
     able to move about the examination room without difficulty as well.  He displayed
3    no difficulty manipulating clothing or personal items.  Surprisingly, the claimant
     asked the examiner at the start of the evaluation if he could lie down, and spent the
4    entire interview lying on his back, rising only to participate in the physical
     examination.  There is no indicated or suggested reason for this behavior, suggesting
5    that the claimant did so only for dramatic presentation.

6    (AR 24.)

7    Finally, the ALJ indicated that Plaintiff testified "[h]e has constant back pain which he rated

8    as 12 on a scale of 1-10.  However, when asked how much he can lift or carry, the claimant

9    responded that he can lift about 70-75 pounds." (AR 21.)  The ALJ noted that Plaintiff had informed

10   Dr. Brimmer "that he can lift or carry 35 pounds."  (AR 24.)

11   In finding that Plaintiff was not entirely credible, the ALJ determined that Plaintiff's

12   testimony was not supported by the medical record.  Although "a finding that the claimant lacks

13   credibility cannot be premised wholly on a lack of medical support for the severity of his pain,"

14   *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997), it is one factor that may be considered.

15   *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction

16   with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."

17   (citation omitted)); *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999)

18   ("Citing the conflict between [the plaintiff's] testimony of subjective complaints and the objective

19   medical evidence in the record, and noting the ALJ's personal observations, the ALJ provided

20   specific and substantial reasons that undermined [the plaintiff's] credibility.")

21   Here, the ALJ found that the medical record only supported a diagnosis of mild scoliosis, and

22   thus did not support Plaintiff's testimony that his back pain rated a "12 on a scale of 1-10." (AR 21.)

23   Further, the ALJ discussed the medical evidence in the record and determined that the evidence did

24   not support Plaintiff's subjective complaints.  As noted above, Plaintiff's own statements as to pain

25   or other symptoms cannot, by themselves, establish a disability.  *See* 20 C.F.R. § 416.929(a).

26   The ALJ noted inconsistent statements by Plaintiff regarding his abilities.  Plaintiff informed

27   Dr. Brimmer that he could lift and carry 35 pounds, but testified at the hearing that he could lift and

28   carry 75 pounds.  (AR 21, 24.)  Plaintiff informed Dr. Seu that he was able to go snowboarding,

which was inconsistent with his need to lie down during an examination.  (AR 24.)  In making a

credibility determination, the ALJ may consider inconsistencies in statements and conduct.  "In

determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such

as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony."

*Burch*, 400 F.3d at 680.

The ALJ also noted that Plaintiff was exaggerating his symptoms.  The ALJ found that during

Dr. Brimmer's medical examination Plaintiff had no difficulty getting up or moving about the room,

which did not support Plaintiff's request to lie on his back during the interview, which was thus

likely done so "for dramatic presentation."  (AR 24.)  A plaintiff's "tendency to exaggerate" is a

valid reason to find the testimony not credible.  *See Tonapetyan*, 242 F.3d at 1148.

The ALJ thus provided several clear and convincing reasons to discount Plaintiff's

credibility.  "Where, as here, the ALJ has made specific findings justifying a decision to disbelieve

an allegation . . . and those findings are supported by substantial evidence in the record, our role is

not to second-guess that decision." *Morgan*, 169 F. 3d at 600 (internal citations omitted).  As the

ALJ's reasons were properly supported by the record and sufficiently specific, the Court must thus

conclude that the ALJ rejected Plaintiff's testimony on permissible grounds and did not arbitrarily

discredit Plaintiff's testimony.  *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir.

2010).[5]

## C.    The ALJ's Consideration of Lay Testimony

Plaintiff contends that the ALJ's failure to account for the testimony of Plaintiff's mother was

clear, reversible error.  (Doc. 12, 8:2-17.)   The Commissioner counters that the ALJ's treatment of

the lay witness testimony was harmless error.  (Doc. 12, 12:5-13:15.)

---

[5] Plaintiff cites to the Seventh Circuit case *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012), for the assertion that the ALJ's entire credibility analysis should be invalided due to the use of "boilerplate" language to introduce the ALJ's credibility finding. (Doc. 12:8:18-10:21.) While the Seventh Circuit did take issue with the use of boilerplate language, in *Bjornson* the case was reversed and remanded to the SSA because of errors the ALJ made in providing a credibility analysis, not because the ALJ used boilerplate language. *Bjornson*, 671 F.3d at 646-49. Here, however, as noted above, the ALJ provided several reasons for rejecting Plaintiff's credibility, and support for those reasons.

1      **1.      Legal Standard**

2      "While an ALJ must take into account lay witness testimony about a claimant's symptoms,

3      the ALJ may discount that testimony by providing 'reasons that are germane to each witness.'"

4      *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Turner*, 613 F.3d at 1224; *Lewis v.*

5      *Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).   In rejecting lay witness testimony, the ALJ need only

6      provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link

7      [her] determination to those reasons."   *Lewis*, 236 F.3d at 512.   An ALJ may reject lay witness

8      testimony if it is inconsistent with the record.  *See, e.g., id.* at 511-12 (rejecting lay witness testimony

9      conflicting with the plaintiff's testimony and the medical record); *Bayliss*, 427 F.3d at 1218

10     (rejecting lay witness testimony conflicting with the medical record).  The ALJ may "draw inferences

11     logically flowing from the evidence." *Sample*, 694 F.2d at 642.  Further, "[i]f the ALJ gives germane

12     reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when

13     rejecting similar testimony by a different witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th

14     Cir.2012).

15
       **2.      The ALJ's Failure to Address the Testimony of Plaintiff's Mother is Harmless
16     Error**

17     The ALJ noted that Plaintiff's mother testified at the hearing that Plaintiff "had neuropathy,

18     and osteoporosis symptoms are getting worse.  The claimant has difficulty sleeping, and tires easily.

19     His ankles occasionally swell." (AR 21.)  The ALJ did not expressly reject the statements made by

20     Plaintiff's mother.  However, the testimony of Plaintiff's mother does not describe any limitations

21     beyond those described by Plaintiff himself, which, as discussed above, were properly discounted

22     by the ALJ.

23     "Where lay witness testimony does not describe any limitations not already described by the

24     claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally

25     well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent

26     to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se." *Molina*,

27     674 F.3d at 1117; *see also Mayo v. Astrue*, No. 1:11-CV-00378 LJO, 2012 WL 2202991, at *17

28     (E.D. Cal. June 14, 2012).  As such, "any error in not expressly rejecting the . . . witness statement[]

1   is harmless as the reasons for rejecting Plaintiff's credibility would apply equally well to the lay

2   witness statements at issue here." *Mayo*, 2012 WL 2202991, at *17. Thus, as Plaintiff's mother

3   discussed limitations that the ALJ rejected based on Plaintiff's testimony, the ALJ's failure to

4   expressly reject the testimony of Plaintiff's mother is harmless error.

5
6   **D.    Plaintiff's Arguments Regarding His Twin Brother's Disability Determination are Not
        Relevant to Plaintiff's Disability Determination**

7          Plaintiff notes that his twin brother had "nearly identical" problems as Plaintiff but a different

8   ALJ determined that Plaintiff's brother remained disabled when he transitioned from the childhood

9   disability framework to the adult one. (Doc. 12, 2:14-3:5.) However, the ALJ can only evaluate the

10  specific claimant before her, and can only review the medical records related to that claimant. Thus,

11  a determination concerning Plaintiff's brother does not impact the ALJ's consideration of Plaintiff's

12  medical evidence. Further, the record indicates that Plaintiff's brother had *different* symptoms, i.e.,

13  Plaintiff's brother had recurring bone fractures that Plaintiff did not suffer. (*See* AR 684 (letter from

14  Dr. Westbie stating, "[t]he one brother, Jerod, has significant scoliosis. Jeremy [Plaintiff's twin

15  brother] has had problems with recurrent bone fractures with fairly trivial trauma.")

16         The Court can only review the ALJ decision before it and determine whether it was supported

17  by substantial evidence in the record as a whole and based on proper legal standards. Here, for the

18  reasons set forth above, the ALJ's decision met those criteria.

19
20  **E.    Plaintiff's Later Determination of Disability Does Not Invalidate the Instant
        Determination that He was Not Disabled**

21         Plaintiff contends that because Plaintiff was later determined to be disabled upon a

22  subsequent application to the SSA, Plaintiff should also have been found to be disabled on this

23  application, and the case should be remanded for an award of benefits. (Doc. 12, 2:4-13.) Defendant

24  asserts that the Court would, if warranted, need to remand the case for further proceedings to allow

25  the Commissioner to reconcile the possibly inconsistent decisions; however, such remand would

26  only occur if the Court could not determine from the record before it that the subsequent award of

27  benefits relied on new evidence.

28

The Ninth Circuit has provided guidance as to when a case should be remanded and the Commissioner is required to reconcile two different disability determinations. In *Bruton v. Massanari*, 268 F.3d 824, 826 (9th Cir. 2001), the plaintiff's initial disability application was denied on April 9, 1996, but a subsequent application for benefits was decided nearly three years later on February 26, 1999, and the plaintiff was found to be disabled. *Id*. at 826. The court held that the district court did not err in denying the plaintiff's motion to remand and found that the differing outcomes were "not inconsistent" because the plaintiff's "second application involved different medical evidence, a different time period, and a different age classification." *Id*. at 827.

However, in *Luna v. Astrue*, 623 F.3d 1032, 1034 (9th Cir. 2010), the plaintiff's first disability application was denied on January 27, 2006, but, based on her second disability application, she was found to be disabled on January 28, 2006, "which is one day after the date [the plaintiff] was found not to be disabled based on her first application." *Id*. at 1034. The Ninth Circuit affirmed the district court's remand of the case so that the Commissioner could conduct further administrative proceedings to reconcile the different disability outcomes. *Id*. at 1033. The Ninth Circuit agreed with "the proposition that, 'in certain circumstances, an award based on an onset date coming in immediate proximity to an earlier denial of benefits is worthy of further administrative scrutiny to determine whether the favorable event should alter the initial, negative outcome on the claim.'" *Id*. at 1034 (citing *Bradley v. Barnhart*, 463 F. Supp. 2d 577, 580-81 (S.D. W.Va .2006)). The court found that because "[t]here was only one day between the denial of [the plaintiff's] first application and the disability onset date specified in the award for her successful second application," and there was "uncertainty" as to the medical evidence considered by the ALJ in the different decisions, "remand for further factual proceedings was an appropriate remedy." *Id*. at 1035.

Here, the factual circumstances are closer to those found in *Bruton* than those in *Luna*. Regarding this appeal, the ALJ rendered the decision finding Plaintiff not disabled on January 19, 2010. (AR 15-26.) Based on a subsequent application, Plaintiff was later determined to be disabled on March 19, 2012. (*See* Doc. 12-1, pp. 2-10.) As such, more than two years had passed since the different disability determinations, unlike the time frame in *Luna* where the decisions were merely one day apart. Further, it appears that the later March 19, 2012, decision considered different

medical evidence in determining that Plaintiff was disabled, since that decision noted that Plaintiff "received hospital care for his diabetes." (*See* Doc. 12-1, p. 8.)  However, the medical evidence considered in the earlier January 19, 2010, decision, the one at issue here in the instant appeal, does not include hospital treatment records for Plaintiff's diabetes for the time frame at issue in the appeal.  While the records in the first January 19, 2010, decision indicate that Plaintiff was being referred for evaluation at Stanford Medical Center, those records were not before the ALJ in this action and thus could not be considered when determining disability.  (*See* AR 684, 805.)

Accordingly, the earlier January 19, 2010, decision finding Plaintiff not disabled is based on "different medical evidence [and] a different time period" from the later March 19, 2012, decision that found Plaintiff disabled.  *Bruton*, 268 F.3d at 827.  Thus, remand is not required since the Court determines that the ALJ relied upon new evidence during a different time period when rendering a subsequent finding that Plaintiff was disabled.

## VI. **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.


IT IS SO ORDERED.

**Dated:      March 26, 2013**                                 **/s/ Sheila K. Oberto**
                                                                UNITED STATES MAGISTRATE JUDGE

26